OPINION OF THE COURT
Frederick J. Marshall, J.
On February 12, 2009, Continental Connection Flight 3407 crashed on approach to the Buffalo Niagara International Airport, killing all 49 passengers and crew, as well as one individual on the ground. Douglas Wielinski died when the fallen aircraft struck his home in Clarence, New York. His wife and daughter, who were also at home, suffered injuries but managed to escape the burning dwelling.
The aircraft was operated by Colgan Air, Inc., a regional carrier, in accordance with a capacity purchase agreement (CPA) with Continental Airlines, Inc. Colgan has admitted that its pilot and copilot were negligent and that the negligence of its pilot and copilot caused the crash of Flight 3407 and the death of Douglas Wielinski.
Continental, in moving for summary judgment, takes the position that it bears no legal responsibility for the happening of the accident. The several bases asserted by Continental will be discussed and decided herein.
To succeed on a motion for summary judgment, the proponent of the motion must establish his cause of action or defense by submitting proof in admissible form so as to warrant a finding by the court that the proponent has established his cause of action or defense, as a matter of law. (Zuckerman v City of New York, 49 NY2d 557 [1980].) Once this showing has been made, the burden shifts to the party opposing the motion to demonstrate by admissible evidence that a material question of fact exists, thus requiring a trial. (See id.) “[M]ere conclusions, expressions of hope or unsubstantiated allegations or assertions are insufficient.” (Id. at 562.)
Continental first contends that it owed no duty to the plaintiffs because it exercised no control of, or supervision over, Colgan and had no say in the hiring, training, or retention of Colgan’s pilots. (See Hamilton v Beretta U.S.A. Corp., 96 NY2d 222 [2001].)
“A duty may arise . . . where there is a relationship either between defendant and a third-person tortfeasor that encompasses defendant’s actual control of the third person’s actions, or between *495 defendant and plaintiff that requires defendant to protect plaintiff from the conduct of others. Examples of these relationships include master and servant, parent and child, and common carriers and their passengers.” (Hamilton v Beretta U.S.A. Corp. at 233.)
Whether a duty exists is a legal determination to be made by the court. (Eaves Brooks Costume Co. v Y.B.H. Realty Corp., 76 NY2d 220 [1990].)
The relationship of Continental and Colgan warrants close examination.
The undisputed evidence shows that Continental and Colgan entered into a “Code-Share” arrangement whereby one airline operates flights which are marketed by another airline. (See aff of John Marshall, June 10, 2014, ][ 7.)[1] In this case, the relationship and obligations of the two airlines were governed by a CPA dated February 2, 2007. (See exhibit A attached to the affirmation of Philipp L. Rimmler, Esq., dated July 14, 2014.)
Under that agreement, which included defendant Pinnacle Airlines Corp.,[2] airplanes owned by Pinnacle would be flown by Colgan, a Federal Aviation Administration (FAA) approved carrier, over designated regional routes established by Continental. These flights would be operated by Colgan under the “Continental Connection” service mark.
Under the CPA, Continental agreed to purchase all the seats on each flight. The seat tickets would then be sold by Continental and Continental would retain all the revenue from such ticket sales. Continental was also responsible for marketing each flight and establishing and publishing fares and schedules. Colgan had the right to use Continental “marks” (i.e., name and logo), and did so both within and without the Flight 3407 aircraft. Finally, Continental provided certain baggage, ground handling and gate services.
Under the CPA, Colgan was responsible for providing the flight and cabin crews, gate agents and other ground personnel necessary to operate the flights. There is no dispute that Captain Renslow, the pilot, and Rebecca Shaw, the copilot on Flight 3407, were employees of Colgan and that Colgan was solely responsible for hiring and training them. Colgan was required to comply with all governmental regulations and was *496 further required to maintain all “certifications, permits, licenses, certificates, . . . required by governmental authorities.” (CPA § 4.02.) At the time of the crash of Flight 3407, Colgan possessed a current operating certificate from the FAA.
Under section 4.03 of the CPA, Colgan was obligated to “provide Regional Airline Services with appropriate standards of care, but in no event lower than such standards utilized by Continental as of the date of this Agreement.” According to section 4.06 of the CPA, Colgan remained “solely responsible for the safe operation of its aircraft.” However, Continental, under the same section, had “the right, at its own cost, to inspect, review and observe [Colgan’s] operations of Scheduled Flights.”
Based on this relationship, Continental claims that Colgan was an independent contractor; that Colgan had absolute control over the aircraft and its crew; that Colgan was responsible for all pilot hiring, pilot training, aircraft maintenance and all in-flight operations.
Generally, a party who retains an independent contractor is not liable for the independent contractor’s negligent acts. (See Kleeman v Rheingold, 81 NY2d 270 [1993]; also see Brothers v New York State Elec. & Gas Corp., 11 NY3d 251 [2008].)
Our common law has, for public policy reasons, produced three general categories of exceptions to the general rule. (See Kleeman at 274.) They are as follows:
1. Negligence of the employer in selecting, instructing or supervising the contractor;
2. Employment for work that is especially or inherently dangerous;
3. Instances in which an employer is under a specific nondelegable duty. (See Kleeman at 274.)
Preliminarily, the court finds that Colgan acted in the capacity of an independent contractor for Continental. The CPA states that “[Colgan] will act, for all purposes, as an independent contractor and not as an agent for Continental.” (See CPA § 7.04 [b].) The CPA further provided that “[n]othing in this Agreement shall be interpreted or construed as establishing between the parties a partnership, joint venture or other similar arrangement.” (CPA § 10.11.)
Plaintiffs’ claim that Colgan was an agent of Continental has no merit. A principal-agent relationship is marked by evidence of the “consent of one person to allow another to act on his or her behalf and subject to his or her control, and consent by the *497 other so to act.” (Maurillo v Park Slope U-Haul, 194 AD2d 142, 146 [2d Dept 1993].) There is no evidence to suggest that Colgan was subject to the control of Continental with respect to its operation of Flight 3407. Continental’s role was limited to ticket sales, the establishment of fares and schedules and certain ground services. It did not have or exercise any control over the hiring and training of Colgan pilots, maintenance or mechanical issues or the in-flight operation of Colgan’s aircraft. Thus, plaintiffs’ claim of an agency relationship fails.
Nor was the relationship of Continental and Colgan one of franchisor and franchisee. Again, the absence of control over the daily operations of Colgan is the deciding factor. (See Hart v Marriott Intl., 304 AD2d 1057 [3d Dept 2003].)
Finally, vicarious liability cannot be imputed to Continental based on a joint venture theory. First, the allegations of a joint venture were raised for the first time in plaintiffs’ answering papers. The plaintiffs’ late allegation of a joint venture fails since there is no evidence that Continental and Colgan agreed to share both profits and losses. (See Dinaco, Inc. v Time Warner, Inc., 346 F3d 64 [2d Cir 2003].)
We next proceed to the issue of whether any of the exceptions stated in Kleeman are present in this case.
A. Negligent Selection and Supervision
In order to establish a common-law claim for negligent selection of a subcontractor, a plaintiff must show that the contractor “either failed to exercise reasonable care in the selection of the [subcontractor] or had actual or constructive knowledge of the [subcontractor’s] insufficiency.” (Waite v American Airlines, Inc., 73 F Supp 2d 349, 355 [SD NY 1999].)
The proof offered by plaintiffs consist of the expert affidavit of Gregory A. Feith, a former field investigator, Regional Director and Senior Air Safety Investigator at the United States National Transportation Safety Board, as well as the deposition testimony of Donald Gunther, who was Continental’s vice-president for Safety.
In examining the plaintiffs’ proof, the court is cognizant of the provision in the CPA whereby Colgan was required to
“provide Regional Airline Services with appropriate standards of care, but in no event lower than such standards utilized by Continental. . . Continental procedures, performance standards and means of measurement thereof concerning the provision of *498 air passenger . . . services shall be applicable to all Regional Airline Services provided by [Colgan]. [Colgan] shall achieve at least the comparable quality of airline service as provided by Continental” (CPA § 4.03).
The court’s attention is also drawn to the near absence of Federal Aviation Regulations or other law governing the selection and supervision of subcontracting domestic regional air carriers. Defendant points to 14 CFR 257 (1999), which requires disclosure of Code-Sharing arrangements. But nothing in the Federal Aviation Regulations governs the selection or supervision process by which one airline subcontracts with a domestic carrier for regional services. (See Marshall aff f 15 [contrast the requirements for safety audits of foreign carriers by U.S. carriers]; Marshall aff ff 13, 14.)
Because of the absence of regulations governing the selection and supervision of Code-Share domestic regional carriers as subcontractors, it cannot be claimed (as Continental has) that there is federal preemption of plaintiffs’ claims of negligent selection and supervision. (See Elassaad v Independence Air, Inc., 613 F3d 119, 129 [3d Cir 2010] [holding that plaintiff’s claims for injury suffered while disembarking an airplane were not preempted by federal law due to the absence of federal regulations governing the conduct of the crew in connection with the loading or unloading of passengers].)
Turning now to the proof offered by plaintiffs that Continental was negligent in selecting and supervising Colgan, the court has considered the affidavit of Gregory A. Feith and the deposition testimony of Donald Gunther, Continental’s former vice-president of safety.
Mr. Feith opined that “[b]y selecting Colgan Air to operate flights on its behalf, Continental failed to ensure that its standard of care for the training of flight crews and the conduct of flights by its crews, was met.” (See Feith aff f 6.) He pointed out that the Colgan pilots never received training on how to respond to the activation of a stick pusher on a Q400 aircraft, the same type of airplane that crashed here. (See also deposition of Patrick Coulter, Sept. 2, 2013, at 328-329, 473-474.)
The deposition testimony of Donald Gunther pointed out that Continental did not take any steps to ensure that the operations by Colgan were maintained in continuous compliance with the standards of care that were mandated by the FAA. (See Gunther aff, exhibit N at 38-41.)
*499 Gunther also testified that, in order for an airline to operate safely, it required not only a proper culture of safety addressing hiring and training, but also additional programs that were not mandated by the FAA, including Threat and Error Management training (Gunther deposition at 512), as well as a Fatigue Management Program (Gunther deposition at 513). Gunther testified that none of these programs were in existence at Colgan prior to the crash of Flight 3407.
There is other evidence in the Feith affidavit that Continental did not take steps to ensure that Colgan was a safe carrier both before it made its decision to select Colgan and while the contract was ongoing.
Continental claims that it relied on the FAA to determine whether Colgan’s pilots were capable and qualified to fly the Q400. It points out that Colgan had a current operating certificate from the FAA and was approved by the Department of Defense to carry military personnel. (Schofield aff 1 6.) Colgan was also on the IOSA Registry[3] following completion of a safety audit. (See Beiersdorf aff, exhibits 36, 33; Morgan deposition, vol II at 595, lines 12-18.)
Clearly there is evidence on both sides of the question that require a jury determination as to whether Continental negligently selected and/or supervised Colgan.
B. Inherently Dangerous Work
The second exception under Kleeman is when work contracted for is inherently dangerous. While the plaintiffs take the position that flying is inherently dangerous, they offer no support, legal, expert or otherwise to support that conclusion. The court finds that the “inherently dangerous work” exception does not apply under these circumstances.
C. Nondelegable Duty
The third Kleeman exception involves those instances where a contractor is under a specific nondelegable duty. (See Kleeman.)
Plaintiffs claim that Continental is under a nondelegable duty to not operate any aircraft in a careless or reckless manner. (14 CFR 91.13.) The key to plaintiffs’ argument is the definition of the term “operate.”
*500 14 CFR 1.1 defines “operate” as follows: “Operate, with respect to aircraft, means use, cause to use or authorize to use aircraft, for the purpose (except as provided in § 91.13 of this chapter) of air navigation including the piloting of aircraft, with or without the right of legal control (as owner, lessee, or otherwise).”[4]
The phrase “operate aircraft” found in the Federal Aviation Act is defined there as follows:
“ ‘operate aircraft’ and ‘operation of aircraft’ mean using aircraft for the purposes of air navigation including—
“(A) the navigation of aircraft; and
“(B) causing or authorizing the operation of aircraft with or without the right of legal control of the aircraft.” (49 USC § 40102 [a] [35].)
Plaintiffs say that the phrases “cause to use or authorize to use aircraft” and “causing or authorizing the operation of aircraft with or without the right of legal control” contained in 49 USC § 40102 (a) (35) are sufficiently clear and include in their scope the conduct of Continental.
The court agrees. The evidence shows that Continental made a decision to contract out its regional routes to a smaller regional airline because Colgan was better suited to operate those regional routes and had access to the proper size aircraft. It is true that Colgan “operated” Flight 3407. It hired, trained and provided the pilots and other crew, maintained the aircraft and controlled most of the important decisions necessary to safely fly its airplanes from point to point.
However, Continental played a critical role in this Code-Share arrangement. It bought the tickets, sold them, established and scheduled the routes and fares, provided certain ground services and required that the Continental mark be placed on the outside of each airplane and within each airplane.
In the court’s view, the various roles that Continental played were critical and essential to each flight flown under the CPA, including Flight 3407. It is safe to say that Flight 3407 would not have taken place without Continental’s authorization.
The court is aware of some FAA administrator decisions which place blame for violations on the airline that actually *501 flew an airplane and either found the Code-Share partner blameless or did not consider the possibility of shared blame. (See Matter of WestAir Commuter Airlines, Inc., 1996 WL 325903, 1995 FAA LEXIS 342 [FAA Order No. 96-16, May 3, 1995].)
This is not to say that every Code-Share arrangement between two airlines will result in a finding that both operated an aircraft. But the undisputed facts here show that the airplane which impacted the Wielinskis’ home, burning it to the ground and killing Douglas Wielinski was operated, as that term is defined by the Federal Aviation Act and the Federal Aviation Regulations, by both Continental and Colgan.
Continental owed a nondelegable statutory duty to the Wielinskis and the other passengers in the airplane to not operate Flight 3407 in a careless or reckless manner and thus, Continental, despite having subcontracted with Colgan, is vicariously liable for Colgan’s negligence and for causing the crash on February 12, 2009.
Continental also contends that the court should grant partial summary judgment dismissing all claims for punitive damages. In accordance with this court’s previously rendered decision, Continental’s motion to dismiss punitive damages claims is granted.
The balance of Continental’s motion for summary judgment is, in accordance with this decision, denied.

. John Marshall is not related to the court.

. Pinnacle was the parent company of Colgan.

. The International Air Transport Association Operational Safety Audit Registry.

. Section 1.1’s reference to 14 CFR 91.13 was evidently adopted to extend the definition of “operate” to encompass the non-navigational, ground-based movement of aircraft on airport premises, as provided for in 14 CFR 91.13 (b). (See Elassaad.) It does not, therefore, change the meaning of the word “operate” in 14 CFR 91.13 (a).